**Electronically Filed
Supreme Court
SCWC-16-0000845
21-DEC-2020
08:28 AM
Dkt. 40 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

DONNA LEE CHING,
Petitioner/Plaintiff-Appellant/Cross-Appellee,

vs.

NANCY LOO DUNG, Individually, and as Trustee under that certain
unrecorded Nancy Loo Dung Revocable Living Trust dated
September 8, 1993; The Estate of DENNIS QUAN KEONG DUNG,
DECEASED AS Trustee under that certain unrecorded Irrevocable
Trust for Dixon Quan Hon Dung, dated June 21, 1995, and as
Trustee under that certain unrecorded Nancy Loo Dung Revocable
Living Trust dated September 8, 1993; PATSY BOW YUK DUNG,
Individually, and as Trustee under that certain unrecorded
Revocable Trust Agreement dated August 19, 2003;
DIXON QUAN HON DUNG; BILLIE DUNG; ANNETTE KWAI FAH DUNG;
DENBY DUNG; DARAH DUNG; DEAN DUNG,
Respondents/Defendants-Appellees/Cross-Appellants.
(CIVIL NO. 07-1-1116-06)

DONNA L. CHING, Individually,
Petitioner/Plaintiff/Counterclaim
Defendant-Appellant/Cross Appellee,

vs.

ANNETTE KWAI FAH DUNG, Personal Representative of the Estate of
Dennis Quan Keong Dung; PATSY BOW YUK DUNG, Trustee of the
Revocable Trust of Patsy Bow Yuk Dung, Individually; BILLIE DUNG,
Individually; DARAH DUNG, Individually; DEAN DUNG, Individually;
DENBY DUNG, Individually,
Respondents/Defendants/Counterclaim
Plaintiffs-Appellees/Cross-Appellants.
(CIVIL NO. 13-1-2929-11)

SCWC-16-0000845

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000845)

DECEMBER 21, 2020

NAKAYAMA, ACTING C.J., WILSON, AND EDDINS, JJ., AND
CIRCUIT JUDGE TONAKI, IN PLACE OF MCKENNA, J., RECUSED,
WITH CIRCUIT JUDGE CRABTREE, IN PLACE OF RECKTENWALD, C.J.,
RECUSED, CONCURRING

OPINION OF THE COURT BY WILSON, J.

## I. INTRODUCTION

This case arises from a dispute that began in 2007 between neighbors, Donna Lee Ching ("Ching") and the Dung family[1] ("Dungs"), over an easement located on the Dungs' property that provides Ching access to her landlocked property. The easement dispute escalated into numerous incidents of alleged wrongful conduct by both Ching and the Dungs, culminating in a $616,000 jury verdict in favor of Ching in 2016.

Both parties appealed to the Intermediate Court of Appeals ("ICA"). The ICA vacated the First Circuit Court's September 15, 2016 Judgment; November 14, 2016 Order Denying Additur; April 12, 2016 Order Granting in Part, and Denying in Part Judgment as a Matter of Law ("JMOL"); January 4, 2017 Order

---

[1] For the purposes of this case, the Dung family consists of Annette Dung ("Annette"), Dixon Dung ("Dixon"), Darah Dung ("Darah"), Dean Dung ("Dean"), and Denby Dung ("Denby").

2

Denying Further JMOL; and January 4, 2017 Order Denying New Trial, holding that the circuit court made numerous errors. The ICA also vacated the jury's verdicts as to Ching's claims for nuisance, civil conspiracy, and malicious prosecution because it found that it was impossible to determine whether the jury's unspecified lump-sum damages award was based on one of the improper grounds that it had vacated. To reach this conclusion, the ICA applied the "general verdict rule"[2] to vacate the entire jury award and remanded the case for a new trial.

On certiorari, Ching raises four points of error and alleges that the ICA erred by (1) sua sponte raising and subsequently misapplying the "general verdict rule," (2) sua sponte raising and then misapplying the law of civil conspiracy, (3) improperly vacating the circuit court's order on judicial admissions and judicial estoppel, and (4) improperly vacating the jury's verdict on nuisance, invasion of privacy, and malicious prosecution claims.

We hold that the ICA erred when it vacated the jury's civil conspiracy verdict, when it vacated the circuit court's order on judicial admissions and judicial estoppel, and when it vacated the jury's verdict on Ching's nuisance, invasion of

---

[2]    The ICA defines the general verdict rule as "where several counts are tried, a general verdict will be upheld if any one count is supported by substantial evidence and is unaffected by error, in the absence of an objection to the form of verdict."

privacy, and malicious prosecution claims.  Our review of the ICA's application of the general verdict rule is unnecessary to the disposition of this case because all of the grounds upon which the jury verdict rested are affirmed.  We consequently reverse the ICA's September 16, 2019 Judgment on Appeal.

## II.  BACKGROUND

### A.  The Easement

Ching is the owner of the property located at 1212A Wilder Avenue ("Lot 28").  The Dungs are the owners of the adjacent property ("Lot 27").  Originally owned as a single undivided property, Lot 27 and Lot 28 were divided into two parcels on September 29, 1944, with an easement running along the edge of Lot 27 so that Lot 28 would have access to Hoonanea Street.[3]

In the 1970s or 1980s, the Dungs constructed a paved driveway from Hoonanea Street over the easement to the border of Lot 28 for their own use.  According to the Dungs, the Ching family did not use the driveway (or the easement) because the properties were separated by a wall, which was later partially removed.  Historically, Ching's property was mainly accessed via

---

[3]     The subdivision was approved in light of "the Petition stating that Lot 28 will have access to Hoonanea Street over Easement 'A'[,]" and the approving order ("Order 5938") also included Map 8, identifying "Easement A" as running along the edge of Lot 27.  Map 8 noted that the easement is 12 feet wide, 1866 square feet, and that "Lot 28 will have access to Hoonanea Street over Easement 'A.'"

4

pedestrian pathways from Wilder Avenue and did not have any vehicular access directly to the property.

**B.     2007 Litigation**

The easement conflict began in 2007, when Ching started construction of a paved ramp connecting her property to the Dungs' driveway and the easement.  To build the ramp, Ching had construction vehicles use the easement for access as it was the only vehicular access to her property.  The Dungs protested the use of their driveway by construction vehicles and eventually erected a chain across the driveway.

On June 21, 2007, Ching filed a Complaint ("2007 Complaint") against the Dungs alleging they had blocked her access to the Easement and interrupted her use and enjoyment of the Easement.  On October 5, 2007, the Dungs filed an Answer to Ching's complaint and a Counterclaim asserting nine counts.  In their Answer, the Dungs acknowledged the existence of an easement for ingress, egress, and temporary parking while unloading and loading.  Following the Dungs' Answer, the 2007 Complaint and the Dungs' Counter-complaint were "informally resolved" by the parties.  Although the Dungs' counsel sent a letter indicating that the Dungs were prepared to stipulate to the existence of the easement, the record does not indicate whether the stipulation was ever finalized or submitted to the

5

courts.  Despite the informal resolution, the case remained pending in circuit court.

## C.    2013 Injunction Against Harassment

Though the parties informally resolved the 2007 Suit, the conflict over the easement continued.  According to Ching, the Dungs would impede her access to the easement by placing objects and plants or parking their cars in the access, preventing her visitors and workers from using the easement, and frequently calling the police when she used the easement.  According to the Dungs, Ching would bother their dogs, trespass against their property and chattel by pushing objects and plants out of the easement, and drive her car recklessly up and down the driveway.

On June 20, 2013, Annette Dung received a Temporary Restraining Order and Injunction Against Harassment ("Injunction Against Harassment") against Ching related to her use of the easement.  At the district court's February 4, 2014 hearing regarding the Injunction Against Harassment,[4] the court recognized the existence of the easement but granted a permanent Injunction Against Harassment for a period of three years

---

[4]    The Honorable James S. Kawashima presided.

because Ching abused the easement by using it "as a way to annoy her neighbors[.]"[5]

D.    2013 Litigation

On November 1, 2013, Ching filed a complaint against the Dungs, which was later amended on May 27, 2015 ("2013 Complaint"). The 2013 Complaint asserted twelve claims: (1) Easement by Grant; (2) Easement by Necessity; (3) Easement by Estoppel; (4) Declaratory Relief; (5) Injunctive Relief; (6) Constructive Trust; (7) Breach of Contract; (8) Invasion of Privacy; (9) Defamation/Slander; (10) Civil Conspiracy; (11) Malicious Prosecution; and (12) Nuisance. The 2007 litigation and the 2013 Complaint were consolidated by order of the court on January 8, 2015.

On August 29, 2014, the Dungs filed an Answer to the 2013 Complaint and a Counterclaim asserting six claims: (1) Abuse of Process; (2) Malicious Prosecution; (3) Trespass; (4) Assault and Battery; (5) Intentional Infliction of Emotional

_____

[5]    Ching appealed the district court's grant of the Injunction Against Harassment, and the ICA affirmed the grant of injunction on June 25, 2015. Dung v. Ching, No. CAAP-14-0000425, 2015 WL 3936910, at *3 (App. June 25, 2015) (SDO). In its SDO, the ICA acknowledged the existence of the easement and noted that easement did "not specify whether it was established for pedestrian access, vehicular access, or both, but Mrs. Dung's family did not have vehicular access to the street until the 1970s and Ms. Ching did not have vehicular access until 2007." Id. at *1 n.3. Ching petitioned this court for a writ of certiorari, which was denied on October 29, 2015. Dung v. Ching, No. SCWC-14-0000425 (S.Ct. Oct. 29, 2015) (cert denied).

Distress; and (6) Declaratory and Injunctive Relief that Ching had no rights to the easement, that the easement was "null and void and of no legal force and effect[,]" and that Ching be enjoined from using the Dungs' driveway.

As Ching's 2013 Complaint was pending, the Dungs obtained a permit and constructed a gate across the easement, closed it, and put up signs warning that trespassers would be prosecuted. The gate required Ching to park her car on Hoonanea Street (because the Dungs' Injunction Against Harassment prevented her from parking on the easement), walk down the easement and open the gate, walk back up the easement to her car, and drive down the easement onto her property.

On October 2, 2014, Ching filed a motion for a preliminary injunction enjoining the Dungs from obstructing her use of the easement for ingress and egress. At the November 7, 2014 hearing, the court noted that the Dungs "did not dispute the existence of the easement for ingress and egress in the 2007 litigation, and the evidence indicates that the plaintiff holds a 12-foot easement over defendants' property for access to Hoonanea Street."[6] The court found that "the gate pose[d] an unreasonable interference with [Ching's] right to use the easement for ingress and egress" and that Ching "has shown that

---

[6]     The Honorable Jeannette H. Castagnetti presided.

8

she is likely to prevail on the merits[.]"[7]  The court ordered

the Dungs to (1) remove the signs at the top of the driveway

warning that the driveway may not be used to service the Ching

residence, (2) remove a bar at the top of the driveway that

prevented work trucks from using the driveway, (3) keep the gate

open at all times, and (4) refrain from "obstructing or

interfering with [Ching's] right to use the easement for ingress

and egress[.]"

On July 1, 2015, Ching filed a Motion for Summary

Judgment ("MSJ") as to the existence of the easement.  Relevant

to this appeal, Ching argued that the court should take notice

of the Dungs' prior judicial admission to the existence of the

easement made in the 2007 litigation.[8]  According to Ching, the

---

[7]  The court also held that:

> Under Hawai'i law, where the width, length and location of an easement for ingress and egress have been expressly set forth in the instrument, the easement is specific and definite.  The express terms of the grant or reservation are controlling in such case and considerations of what may be necessary or reasonable to a present use of the dominant estate are not controlling.  If, however, the width, length and location of an easement for ingress and egress are not fixed by the terms of the grant or reservation, the dominant estate is ordinarily entitled to a way of such width, length and location as is sufficient to afford necessary or reasonable ingress or egress.  That's the Consolidated Amusement Company case, 6 Hawai'i App. 312, 317-18.  That's a 1986 case.

[8]  Ching also identified other places where the Dungs demonstrated their belief and acknowledgement that an easement exists for ingress and egress, including an October 7, 2006 email from Annette to Ching, an October 31, 2006 letter from Annette to Ching, and a June 21, 2007 letter from the Dungs' attorney, Bert T. Kobayashi, to Ching's attorney, Wayne Mau.

(continued . . .)

Dungs' acceptance of the easement's existence is further evidenced by the fact that the 2007 litigation was informally

---

(continued . . .)

In the October 7, 2006 email to Ching, Annette wrote:

> 1. I understand that the new curb cut and necessary connections from the street to the existing easement are your responsibility.
>
> 2. I will remove the low rock wall on the Dung property at the top of the driveway. Please note that access to the easement from the street is blocked by a No Parking sign and a utility pole.

In the letter to Ching dated October 31, 2006, Annette wrote:

> 1. The measurement of the 12 foot easement shall be from the property line as staked by our professional licensed surveyor. The official land use documents do not specify that the measure of the 12 foot easement shall be taken from the "inside" of our rock wall.
>
>     . . . .
>
> 6. As previously discussed, the easement is for ingress/egress purposes only.
>
> 7. . . . The time of the easement agreement dates back to the early 1940's [sic]. According to our findings, the only specified language defining the easement is, "a grant of a right to use a strip of land for a specific purpose."

In Mr. Kobayashi's letter, he wrote in pertinent part:

> With regard to the injunctive relief requested, Mrs. Dung agrees for the land owners that what is being requested is consistent with what her understanding is at this time and that there is no need to request injunctive relief through the Courts. The only point that my [sic] be in question is the ability to park on the easement as the easement is one that can be used by both the land owners and the Chings. I have advised Mrs. Dung and she agrees that parking is within the use of an ingress and egress easement if it is for the purposes of loading and unloading . . . . Therefore, I am authorized to advise you that my clients, who are named as defendants: . . . agree that I have the authority upon presentation (if you believe such stipulation to be necessary) to execute a stipulation to the effect that they will not block, interfere with or obstruct the easement in question.

resolved after the Dungs admitted to the existence of the easement for ingress and egress in the 2006 and 2007 correspondence and in their answer to the 2007 Complaint.  Ching argued that following this informal resolution, the Dungs did not object to the construction of the ramp connecting her property to the easement over the Dungs' driveway, and she thereafter made frequent use of the easement for ingress and egress.

In response, the Dungs argued that Ching cannot establish that an easement exists based on judicial admissions or under a theory of judicial estoppel because, (1) "the Dungs are not competent to testify as to legal conclusions such as the creation or termination of easements," (2) their 2007 litigation statements were a legal position rather than a factual admission, (3) the 2007 position was not inconsistent with the Dungs' current position, (4) the 2007 proceeding is not part of the "same proceeding[,]" (5) "the legal landscape . . . changed from the law in 2007" because there was new precedent in Hawai'i providing for the termination of easements by prescription, and (6) had the Dungs been able to retain their requested expert, "they would have known, as they do now, that Easement 'A' was, if anything, a 'paper' easement."

On August 13, 2015, a hearing was held on Ching's MSJ.[9] The court noted that in the 2007 case, the Dungs' legal counsel "was prepared to stipulate to the existence of that easement" and that "it is clear to this Court that an easement was recognized by the parties and does exist." The court granted Ching's MSJ in part and denied it in part, by recognizing the easement as valid but leaving to the jury the determination of whether the easement is for vehicular use, pedestrian use, or both, among other issues.

Following opposing requests by the parties, the court held a Hearing Regarding Legal and Equitable Issues to determine whether the scope of the Easement is a question of law for the court to determine or a question of fact for the jury to determine on January 25, 2016. The court then ruled and issued an order that the Dungs were judicially estopped from: (1) denying the existence of an access easement; (2) denying that the easement is for ingress and egress; and (3) denying that the easement is for vehicular travel and the reasonable loading and unloading of material from plaintiff's property. The court determined that certain other terms and conditions of the easement were open questions of fact for the jury to decide,

---

[9]     The Honorable Gary Won Bae Chang presided.

including:  (1) whether the easement includes pedestrian access;
and (2) whether the easement allows stopping or parking.

Prior to trial, the court ruled on the parties'
Motions in Limine ("MIL").[10]  Ching filed ten MIL.  Ching's MIL
No. 2 sought to preclude the Dungs from denying the existence of
the easement.  The circuit court granted Ching's MIL No. 2 but
allowed the Dungs to assert the defense of abandonment.

The circuit court granted Ching's MIL No. 3, which
sought to preclude the Dungs from claiming the easement is not
for pedestrian ingress and egress.

Ching's MIL No. 7 sought to strike the testimony of
Professor Robert Bruce Graham, Jr. ("Professor Graham") because
Professor Graham's testimony that the easement was "a paper
easement" that would not have been intended to include vehicular
access was irrelevant.  The court denied the MIL in part,
allowing Professor Graham to "educate the jury about what
consolidation and re-subdivision involves[,]" and granted the
MIL in part to preclude "all other opinion testimony of
[Professor] Graham."

The circuit court granted the Dungs' only MIL, which
sought an order from the court stating that Ching's "misuse of
the subject easement has already been adjudicated and therefore

_____

[10]     Only MIL relevant to this appeal are discussed in this Opinion.

13

Hawai'i law principles of collateral estoppel (or issue preclusion) apply." The Dungs argued that the district court, in granting the Dungs' Injunction Against Harassment, determined that Ching used the easement to harass the Dungs during the 2014 Injunction Against Harassment and that harassment is "identical to the 'misuse' element of the Dungs' equitable claim that Ching's easement should be terminated or restricted." The circuit court granted the Dungs' MIL, but limited the evidence of Ching's "easement abuse" to the findings made by the district court when it granted the Dungs' Injunction Against Harassment and precluded any reference to the phrase "easement abuse" and limited "the evidence to the determinations of Judge Kawashima through the date of the injunction that was issued."

A jury trial before the circuit court began on February 16, 2016 and concluded on March 4, 2016. In accordance with the Special Verdict form, the jury found that: (1) the subject easement was for both pedestrian and vehicular use; (2) the Dungs, including Annette Dung, Dixon Dung, Dean Dung, Denby Dung, and Darah Dung, engaged in a civil conspiracy against Ching; (3) the Dungs, including Annette Dung, Dixon Dung, Dean Dung, Denby Dung, and Darah Dung, committed nuisance against Ching; (4) the Dungs, including Annette Dung, Denby Dung, and Darah Dung, invaded Ching's privacy; (5) the Dungs, including

14

Annette Dung, Denby Dung, and Darah Dung, defamed Ching; and (6) Denby Dung "and/or" Darah Dung engaged in an act of malicious prosecution against Ching.  The jury found that Ching's damages consisted of Special Damages of $16,600.00, General Damages of $500,000.00, and Punitive Damages of $100,000.00 for a total award of $616,000.00.  The jury also found that:  (1) Ching had not abandoned the easement; (2) Ching had not misused her easement rights; (3) Ching had not intentionally inflicted emotional distress upon any of the Dungs; and (4) that the Dungs were not entitled to damages.

After trial, on March 9, 2019, the court denied both parties' requests for equitable relief because both sides had "unclean hands[.]"  The circuit court entered Final Judgment on September 15, 2016.

E.    Proceedings Before the ICA

Both Ching and the Dungs appealed.  The ICA entered the Opinion of the Court on August 15, 2019 and entered its Judgment on Appeal on September 16, 2019.  In its Opinion, the ICA held that the case must be remanded for a new trial because the circuit court made numerous errors, discussed below.

1.    Judicial Admissions and Estoppel

The ICA concluded that the Dungs' statement that they have "always fully accepted the idea of an easement for ingress

15

and egress" was "not a statement of concrete fact" and that it was also "not an admission concerning the intent of the original parties to the Easement's creation[.]" The ICA then held that the Dungs' answers to the 2007 Complaint were not "sufficiently clear, deliberate, and unequivocal that they should be decisive to the outcome of an issue that is so central to the dispute between the parties[.]"

The ICA reviewed the record and concluded that the easement was "ambiguous" because there was "no additional information regarding the scope or intended use of the Easement." Consequently, the ICA found that the scope of the easement was a question of fact for the jury to decide, and the circuit court was wrong to conclude that the Dungs had judicially admitted that the scope includes vehicular access.

Thus, the ICA concluded that the circuit court erred in ruling that the Dungs made a judicial admission, when it estopped the Dungs from denying the scope and use of the easement. The ICA also concluded that the circuit court erred when it estopped the Dungs from presenting evidence concerning the scope of the easement.

### 2. Limitation of Expert Testimony

The ICA suggested that the circuit court limited Professor Graham's testimony at trial because it had concluded

16

that the Dungs "judicially admitted critical facts regarding the Easement's scope[.]"  The ICA did not decide whether Professor Graham's testimony should have been admitted at trial, instructing the circuit court "to reconsider whether the Dungs' expert's proposed testimony meets the standards for expert testimony and would provide relevant evidence regarding, inter alia, the scope of the Easement."

### 3.   Injunction Against Harassment

The ICA concluded that the Injunction Against Harassment was relevant at trial and "was critical to explain (and perhaps justify) why the Dungs called the [Honolulu Police Department ("HPD")] to report various actions of Ching that they believed violated the Injunction."  The ICA noted that "[t]here were numerous instances at trial in which the Injunction was mentioned or referred to by witnesses" and concluded that the Injunction was "highly relevant to the issue of whether the Dungs' calls to the HPD were a nuisance."  Accordingly, the ICA held that the circuit court abused its discretion when it refused to admit into evidence the Injunction Against Harassment.  The ICA appeared to base this determination, at least in part, on the fact that the circuit court admitted the Preliminary Injunction in favor of Ching while excluding the Injunction Against Harassment in favor of the Dungs.

17

### 4.    JMOLs on Invasion of Privacy, Defamation, Malicious Prosecution, Nuisance, and Damages

The ICA reviewed each of the Dungs' JMOLs as to Ching's claims, including Nuisance, Invasion of Privacy, Defamation, and Malicious Prosecution.

In its review of the circuit court's disposition of the Dungs' motions for JMOL as to Ching's nuisance claim, the ICA "conclude[d that] there was sufficient evidence to submit Ching's nuisance claim to the jury." The ICA, however, vacated the nuisance claim because it held that the circuit court's ruling on the Dungs' judicial admissions/estoppel had been error. The ICA explained, "[i]f the Dungs could establish that the scope of the Easement does not include vehicular use, then acts obstructing Ching's vehicular access to the Easement could be considered reasonable and of right."

Next, the ICA reviewed all three of Ching's theories upon which her invasion of privacy claim was based, including: (1) intrusion upon seclusion; (2) false light; and (3) unreasonable publicity. The ICA also identified three categories of actions taken by the Dungs which Ching argued supported her claims, including:  (1) videotaping her; (2) yelling offensive and derogatory statements about Ching that others could hear; and (3) posting derogatory comments, video,

and images about Ching on Denby and Darah Dung's Facebook ("Dungs sisters' Facebook") page.

The ICA characterized Ching's intrusion upon seclusion theory as being based on the Dungs' videotaping. The ICA concluded there was no intrusion upon seclusion because the video cameras were directed at the easement, which is "a public, not a private, place[.]"

Next, the ICA held that there was insufficient evidence to support Ching's false light and unreasonable publicity claims based on the Dungs yelling derogatory statements at Ching. The ICA noted that both theories require a showing of "unreasonable publicity" to the "public at large" and asserted that the evidence adduced at trial showed only that Ching's male visitors could hear the Dungs' yelled insults and "crude references to sexual conduct." According to the ICA, "the yelled statements emanating from the Dung Property were not communications to the 'public at large' or 'to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" The ICA, however, did find the Dungs sisters' Facebook postings provided "sufficient evidence [of] the publicity requirement" to support a jury verdict under false light and unreasonable publicity theories.

The ICA then reviewed the evidence adduced at trial related to the Dungs' defamatory statements regarding Ching's sexual predilections and concluded that there was sufficient "evidence presented" to warrant the "submission of the defamation claim to the jury."  Therefore, the ICA held, the circuit court was correct to submit the defamation claim to the jury and the verdict should stand.

For Ching's civil malicious prosecution claim, the ICA addressed:  (1) when Ching stopped her vehicle at the top of the easement, got out, and took a photograph of encroachments in the easement; and (2) when Ching was sprayed with water by Darah and Denby, and sprayed them back.

As to the first instance, the ICA noted that the Injunction Against Harassment was in effect at the time of the incident and the Dungs called the police to report that Ching had violated the Injunction by stopping on the easement, causing Ching to be arrested and charged with harassment.  According to the ICA, "Ching testified that, at the court hearing she attended with counsel, the prosecutor 'downgraded' the charge to a parking citation to which Ching pleaded guilty[.]"  The ICA concluded that Ching had "compromised" or "bought peace" through a plea agreement and therefore could not "assert that the proceedings . . . terminated in [her] favor."  Because the

20

alleged malicious prosecution did not terminate in Ching's favor, the ICA held that the circuit court erred in submitting the claim to the jury based on this incident.

As to the second instance, the ICA noted that Ching had admitted at trial that she sprayed Darah and Denby with water but testified that Darah and Denby had sprayed her (and her washer/dryer) with water before she sprayed them back. While the ICA noted that, in this instance, the proceeding had terminated in Ching's favor with her acquittal, the ICA held that a prosecutor's independent determination that there was probable cause to proceed broke the chain of causation and insulated the Dungs from liability for malicious prosecution.

Although not raised on appeal by Ching or the Dungs, the ICA reviewed the jury verdict on Ching's civil conspiracy claim and concluded that it must be vacated due to its "inability to determine" which underlying tort the civil conspiracy claim was based upon. According to the ICA, "a conspiracy claim is not an independent cause of action, but is only the mechanism for subjecting co-conspirators to liability when one of their members committed a tortious act." The ICA described Ching's civil conspiracy claim as "unspecified" and thus, vacated the jury's civil conspiracy verdict.

After vacating the circuit court's nuisance, invasion of privacy, malicious prosecution, and conspiracy judgments, the ICA concluded that it was required to vacate the entire damages award and remand the case for a new trial because the special verdict only provided a lump sum award with no allocation of the damages. The ICA explained that because "only Annette, Denby, and Darah's liability for defamation is being fully affirmed, and it is unclear what tortious conduct the jury found to be underlying a conspiracy," the jury's general verdict cannot be sustained.

The ICA concluded that "the Hawai'i Supreme Court's decision in Rodrigues . . . is most consistent with the application of the Baldwin rule - which holds that a general verdict cannot stand when one or more issues are erroneously submitted to a jury."[11] See Maryland v. Baldwin, 112 U.S. 490 (1884); Rodrigues v. State, 52 Haw. 156, 472 P.2d 509 (1970). The ICA declined to "reach the question of whether Hawai'i courts

_____

[11]    In Rodrigues v. State, this court held that:

> The award of a lump sum for different claims is not reversible error. However, failure to state the amount awarded for each claim makes it impossible for the reviewing court, absent any other indication in the record, to amend the lump sum award when it is decided on appeal that error was committed concerning the consideration of a particular claim by the factfinder, the excessiveness or adequacy of an award, or the evidence necessary to sustain an award.

52 Haw. at 175, 472 P.2d at 521.

would apply a 'strict' Baldwin standard, or a less restrictive approach utilizing a harmless error analysis."  The ICA reasoned that because a nuisance action protects a different interest than a defamation action, it could not "conclude, absent some specific indication in the record, that the damages suffered by Ching would be the same for both of these injuries . . . ."  As such, the ICA vacated the jury's damage award.

Ching filed a timely application for writ of certiorari on October 11, 2019, and we accepted her application.

### III.  STANDARDS OF REVIEW

#### A.  Judicial Admissions and Judicial Estoppel

A circuit court's determination that a party is entitled to summary judgment based, in part, on a judicial admission is reviewed de novo.  See, e.g., Wells Fargo Bank, N.A. v. Omiya, 142 Hawai'i 439, 454, 420 P.3d 370, 385 (2018); Lee v. Puamana Cmty. Ass'n, 109 Hawai'i 561, 573-74, 128 P.3d 874, 886-87 (2006).

The circuit court's decision to apply the doctrine of judicial estoppel to prevent a party from taking "inconsistent positions or [from taking] a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him" is reviewed de novo.  See Rosa v. CWJ

23

Contractors, Ltd., 4 Haw. App. 210, 218, 664 P.2d 745, 751 (1983).

B.      Expert Testimony

"Generally, the decision whether to admit expert testimony rests in the discretion of the trial court.  To the extent that the trial court's decision is dependent upon interpretation of court rules, such interpretation is a question of law, which [the appellate] court reviews de novo."  Barcai v. Betwee, 98 Hawai'i 470, 479, 50 P.3d 946, 955 (2002) (citations omitted).

C.      Motion for Judgment as a Matter of Law

When reviewing the circuit court's grant or denial of a motion for judgment as a matter of law:

> It is well settled that a trial court's rulings on motions for judgment as a matter of law are reviewed de novo.
>
> When we review the granting of a [motion for judgment as a matter of law], we apply the same standard as the trial court.
>
> A [motion for judgment as a matter of law] may be granted only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor.

Aluminum Shake Roofing, Inc. v. Hirayasu, 110 Hawai'i 248, 251, 131 P.3d 1230, 1233 (2006) (quoting Miyamoto v. Lum, 104 Hawai'i 1, 6-7, 84 P.3d 509, 514-15 (2004) (internal citations omitted).

D.    **Rule 403 Exclusion of Evidence**

In State v. West, 95 Hawai'i 452, 24 P.3d 648 (2001), this court stated:

> [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue.  When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard.  However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

Id. at 456-57, 24 P.3d at 652-53 (quoting Kealoha v. Cnty. of Hawaii, 74 Haw. 308, 319-20, 844 P.2d 670, 676 (1993)).

"A trial court's determination that evidence is 'relevant' within the meaning of HRE [(Hawai'i Rules of Evidence)] Rule 401 (1993) is reviewed under the right/wrong standard of review."  State v. St. Clair, 101 Hawai'i 280, 286, 67 P.3d 779, 785 (2003).

E.    **Jury Damages Award**

"Generally, we do not disturb the findings of the trial court on the issue of damages absent a clearly erroneous measure of damages."  Castro v. Melchor, 142 Hawai'i 1, 16, 414 P.3d 53, 68 (2018) (citations omitted).

Regarding punitive damages, the "[a]ward or denial of punitive damages is within the sound discretion of the trier of fact" and "[a]bsent a clear abuse of discretion, we will not reverse a trier of fact's decision to grant or deny punitive

damages."  Ditto v. McCurdy, 86 Hawai'i 84, 91, 947 P.2d 952, 959 (1997) (citations omitted).

## IV.  DISCUSSION

### A.    Judicial Admissions/Estoppel

The ICA erred in vacating the circuit court's determination that the Dungs judicially admitted to the existence of the easement and that its scope included vehicular ingress and egress.  The circuit court was also well within its discretion to apply the doctrine of judicial estoppel to prevent the Dungs from denying the existence of the easement or that its scope included vehicular ingress and egress.  Any error in applying the doctrine of judicial admissions and/or judicial estoppel was harmless because the parties actually litigated the issue, and the jury decided the question of whether the easement included vehicular access, pedestrian access, or both.

This court has consistently held that "a party's factual allegation in a complaint or other pleading is a judicial admission which binds the party."  Int'l Bhd. Of Elec. Workers, Local 1357 v. Hawaiian Tel. Co., 68 Haw. 316, 320 n.2, 713 P.2d 943, 949 n.2 (1986); see also Lee, 109 Hawai'i at 573-74, 128 P.3d at 886-87.  Notably, Hawai'i Rules of Civil Procedure ("HRCP") Rule 8(b) provides in relevant part that "[a] party shall state in short and plain terms defenses to each

26

claim asserted and shall admit or deny the averments upon which the adverse party relies." Likewise, HRCP Rule 8(d) provides in relevant part that "[a]verments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading." Together, HRCP Rules 8(b) and 8(d) demonstrate that a party may admit a fact at issue in a lawsuit by failing to deny a specific averment in the Answer to a Complaint, which removes the admitted fact from the field of controversy. See Lee, 109 Hawai'i at 573, 128 P.3d at 886 (holding that a "judicial admission is 'a formal statement, either by [a] party or his or her attorney, in [the] course of [a] judicial proceeding [that] removes an admitted fact from [the] field of controversy.'").

It is incongruous with HRCP Rule 8 to require that a trial court conduct an inquiry into the factual foundation of every admission made by parties in their pleadings prior to allowing that admission to be removed from the field of controversy. The difficulty of conducting an inquiry into the factual foundation of every admission is especially apparent considering that a party may make an admission simply by failing to deny an averment, in which case the inquiring court would have no factual foundation to review.

Here, the Dungs voluntarily and explicitly admitted "the fact" that the easement "was for access and the reasonable loading and unloading of material from [Ching's] property" in their Answer to the 2007 Complaint:

> All of the answers are to take into consideration the fact that the Defendants have always fully accepted the idea of an easement for ingress and egress consistent with the easement described in the applicable Land Court documents with two exceptions:  (a) at the point where the easement joins Hoonanea Street, the utility company and the county had erected a pole and signs that prevented access to the easement without trespassing onto the property of the Defendants . . . (b) the fact that while the easement was for access and the reasonable loading and unloading of material from the Plaintiffs' property, it did not allow the parking of vehicles or the placing of stationary material on the easement so as to interfere with the Defendant's use of the easement after the actual loading and unloading were accomplished.

Later, Dungs' counsel confirmed that the Dungs were referring to "vehicles" when they admitted that the easement was for "loading and unloading" in their Answer.

Additionally, the 2007 and 2013 lawsuits were consolidated at the Dungs' request and thus, are a single proceeding.  In their Opening Brief before the ICA, the Dungs argued that they could not be held to admissions made in the 2007 litigation because it was a separate and distinct proceeding that involved "different issues" from the 2013 litigation.  Whether two lawsuits that are later consolidated should be treated as a single proceeding for purposes of judicial admissions and/or judicial estoppel is a novel question under Hawai'i Law.  However, this court need not address this

question because the Dungs filed the Motion to Consolidate upon which the court's Consolidation Order ruled.  In their Motion to Consolidate, the Dungs argued that the two cases had "nearly identical" parties, "undeniably involve a common question[]" of law, and similar questions of fact.  The circuit court granted the Dungs' request to consolidate the two actions.  As such, the 2007 and 2013 litigation is treated as the "same proceeding" for purposes of judicial admissions and judicial estoppel.

Although related to the doctrine of judicial admissions, the doctrine of judicial estoppel is a distinct legal doctrine that "partakes . . . of positive rules of procedure based on manifest justice and, to a greater or less[er] degree, on considerations of the orderliness, regularity, and expedition of litigation."  Roxas v. Marcos, 89 Hawai‘i 91, 124, 969 P.2d 1209, 1242 (1998).  The doctrine of judicial estoppel provides that:

> [a] party will not be permitted to maintain inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts, and another will be prejudiced by his action.

Id.  The "doctrine prevents parties from playing 'fast and loose' with the court or 'blowing hot and cold' during the course of litigation."  Id.  Under the doctrine of judicial estoppel, a party must demonstrate that:  (1) the other party's

29

later position is "clearly inconsistent" with its earlier position; (2) the other party succeeded in persuading a court to accept its earlier position; and (3) the other party would derive an advantage for itself or impose a detriment on the opposing party if not estopped. Lee, 109 Hawai'i at 576, 128 P.3d at 889 (quoting New Hampshire v. Maine, 532 U.S. 742, 750–51 (2001)).

The Dungs' repeated changes of position satisfy all three parts of the above test and support Ching's assertion of judicial estoppel. First, the Dungs' position in the 2007 litigation, that "the easement was for access and the reasonable loading and unloading of material from the Plaintiffs' property[,]" is "clearly inconsistent" with their position in the 2013 litigation, that the "easement does not exist" or if it does exist, the easement is only for "pedestrian use." Second, the Dungs succeeded in persuading the court, as well as Ching and her lawyers, to accept their earlier position with respect to the existence and scope of the easement. In a letter to the court following Ching's initiation of the 2007 lawsuit, the Dungs reiterated their original position—that the easement existed and included vehicular access—and asserted that "there is no need to request injunctive relief through the Courts." Moreover, a multitude of related judicial rulings including

30

rulings at the district court,[12] circuit court,[13] and the ICA[14] relied on the Dungs' original position that the easement exists and includes vehicular access. Third, the Dungs have realized multiple benefits and advantages from their original position. The Dungs convinced Ching to stop pursuing her 2007 suit based on their representation as to the existence and scope of the easement. The Dungs avoided costly litigation of the multiple claims that Ching had asserted in the 2007 suit and also succeeded in convincing Ching to stop pursuing a TRO requesting injunctive relief against the Dungs. Likewise, Ching has suffered multiple legal and pecuniary detriments in reliance on the Dungs' original position. Following the Dungs' Answer to the 2007 Complaint and their accompanying letter in which they represented that the parties had come to a resolution, Ching spent money to build a carport on her property and connect it to her easement over the Dungs' driveway. Thus, Ching has met the requirements for asserting judicial estoppel to estop the Dungs

---

[12] At the district court proceedings on Annette's TRO and Injunction Against Harassment, Judge Kawashima relied on the Dungs' position in ruling that Ching could not stop, park, walk, or otherwise use the easement apart from non-stop vehicular travel from Hoonanea Street to her property.

[13] Judge Castagnetti relied on the Dungs' position that the easement existed and included vehicular access when she ordered the Dungs to remove the obstructions that they had placed on Ching's easement.

[14] In the ICA's summary disposition order affirming the district court's Injunction Against Harassment against Ching, the court stated that: "On appeal, the Dungs do not deny the existence of the Easement."

from denying that the easement exists and includes vehicular access.

Moreover, the jury decided the issue of whether the easement includes pedestrian access, vehicular access, or both, so any error committed by the circuit court with respect to judicial estoppel and judicial admissions was harmless. The jury instructions that were read to the jury instructed: "that Plaintiff has a 12 foot wide access easement over the Defendants' property. It is for the jury to decide whether the permitted access includes pedestrian use, vehicular use, or both." Another jury instruction provided that: "[t]he nature and scope of an easement is to be determined by the intention of the creator of the easement and the facts and circumstances at the time of its creation. It cannot be unilaterally increased or decreased beyond the right originally intended to be granted." These instructions demonstrate that the jury was charged with determining the scope of the easement. Additionally, the jury's special verdict form specifically asked whether the scope of the easement included vehicular access, pedestrian access, or both. The jury indicated on the special verdict form that the easement provides both pedestrian and vehicular use.

The fact that the jury actually determined the scope of the easement renders any potential error that the circuit court made in ruling on judicial estoppel and/or judicial admissions harmless beyond a reasonable doubt.

**B.    Nuisance and Expert Testimony**

The ICA relied on its determination that the circuit court erred in judicially estopping the Dungs from denying the existence and scope of the easement when it vacated the jury's nuisance verdict and overturned the circuit court's limitations on the Dungs' expert witness testimony.  Because the ICA erred in its ruling on judicial admissions/estoppel, the jury's nuisance verdict and the circuit court's ruling on expert testimony are reinstated.

**C.    Civil Conspiracy**

The ICA erred in vacating the jury's civil conspiracy verdict because the issue was waived, and the circuit court is deemed to have made the necessary finding under HRCP Rule 49.

Under HRCP Rule 49(a) (2000), the court may require a jury to return a special verdict in the form that "it deems most appropriate" and, if the court "omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted" unless that "party demands its submission to the jury."  HRCP Rule 49(a).  If a

party fails to make such a demand, the court "may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict." Id.

Under HRCP Rule 49(a), if the Dungs sought to challenge the special verdict on civil conspiracy, they were required to demand that the court require the jury to identify the underlying tort upon which the civil conspiracy claim was based. Because they failed to do so, the trial court is deemed to have made the necessary finding in accord with the judgment on the special verdict. As such, the trial court should be deemed to have found the civil conspiracy was based on an underlying tort.

The jury's civil conspiracy verdict was based on the underlying tort of nuisance. Notably, the special verdict form listed all five Dungs (Annette, Dixon, Dean, Denby, and Darah) as having been "engaged in the civil conspiracy against" Ching. The only other cause of action for which the jury found all five Dungs liable was the nuisance claim.

Ching argued that the Dungs were in a conspiracy to engage in nuisance against her. The jury's matching verdicts for nuisance and conspiracy demonstrate that nuisance was the underlying tort for the civil conspiracy verdict. Therefore,

the ICA erred when it vacated the jury's civil conspiracy verdict based on its "inability to determine" the underlying tort.  The civil conspiracy verdict is reinstated.

**D.    District Court Injunction Against Harassment**

The ICA erred when it ruled that the circuit court abused its discretion by excluding from the jury's consideration the district court's Injunction Against Harassment.  The circuit court determined that the probative value of the Injunction Against Harassment was substantially outweighed by the danger of unfair prejudice under Hawai'i Rules of Evidence ("HRE") Rule 403.[15]  The ICA concluded that the circuit court's weighing of the evidence constituted an abuse of discretion.

To abuse its discretion, the circuit court must have "clearly exceed[ed] the bounds of reason or disregard[ed] rules or principles of law or practice to the substantial detriment of a party litigant."  Samson v. Nahulu, 136 Hawai'i 415, 425, 363 P.3d 263, 273 (2015) (quoting State v. Ganal, 81 Hawai'i 358,

---

[15]    HRE Rule 403 provides:

Rule 403 Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.  Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  HRE Rule 403 (2010).

373, 917 P.2d 370, 385 (1996). Based on our review of the record, the circuit court did not "exceed the bounds of reason," "disregard rules or principles of law," and the Dungs did not suffer a substantial detriment.

The record demonstrates that the circuit court neither "clearly exceed[ed] the bounds of reason" nor "disregard[ed] rules or principles of law to the substantial detriment of a party litigant."

First, the circuit court did not "exceed[] the bounds of reason." The circuit court carefully considered the issue and provided extensive explanations on the record to support its determination under the HRE Rule 403 balancing test that the probative value of the Injunction Against Harassment was substantially outweighed by the danger of unfair prejudice. After arguments from both Ching and the Dungs, the court ruled that the limited record regarding the Injunction Against Harassment trial and the possible confusion the Injunction Against Harassment could create for jurors counseled against admitting the Injunction Against Harassment. In particular, the circuit court ruled:

> Exhibit A-2 for identification is an adjudication by Judge Kawashima in a District Court trial regarding a harassment charge. Harassment is a particular charge that is statutorily defined. I don't know what all the evidence was. I don't know other than a few cryptic remarks about what Judge Kawashima said in his transcript wherein he concluded that a charge of harassment was proven.

> So on the record at this time, it's the conclusion of the Court that the danger that the jurors, who are struggling to try to understand everything, could unfairly latch on to Exhibit A-2 for identification, which is the injunction against harassment that was issued by Judge Kawashima in the District Court, and simply come to the conclusion, Well, that's an adjudication by one court, that judge must be right, it doesn't say what Donna Ching did or didn't do, but she's found guilty, so she must be guilty of everything.
>
> And I think that's the danger Judge Kawashima tried to steer clear of in his ruling -- is to not prejudice the outcome of this trial, because he was aware that this trial was pending. So that would be undue prejudice under 403 that this Court is not permitted to allow.

The ICA opined that a "curative instruction could be crafted to address concerns regarding prejudice." In fact, the circuit court specifically addressed the potential for a curative instruction and determined that the risk of confusion and unfair prejudice would nevertheless substantially outweigh the probative value of the Injunction Against Harassment.

The ICA implied that the circuit court abused its discretion because it allowed into evidence the circuit court's Preliminary Injunction in favor of Ching (that required the Dungs to remove the obstructions that they had constructed on the easement) while disallowing the admission of the district court's Injunction Against Harassment in favor of the Dungs. However, the balance between probative and prejudicial value is not equivalent as applied to the Injunction Against Harassment and the Preliminary Injunction. The Injunction Against Harassment was entered pursuant to a limited record, without a

jury, and without discovery. Moreover, the Injunction Against Harassment established that a judge determined that Ching had "harassed" the Dungs, an issue confusingly close to the question of "easement misuse" that the jury was charged with deciding in the instant case.[16] In contrast, the circuit court's Preliminary Injunction, only established that the Dungs were required to keep open the gate that they had built at the bottom of their driveway, which is not at issue in the instant case. For these reasons, the circuit court did not abuse its discretion by allowing in the Preliminary Injunction while excluding the Injunction Against Harassment.

The circuit court also did not abuse its discretion by "disregard[ing] rules or principles of law to the substantial detriment of" the Dungs. The ICA implied that the Dungs were unable to explain the basis for their frequent 911 calls without entering the actual Injunction Against Harassment into evidence. In fact, the Dungs introduced substantial evidence at trial to explain why they were calling the police, with multiple Dung witnesses mentioning the "TRO," "Injunction," and "restraining order" against Ching repeatedly throughout trial. Evidence,

---

[16] Question No. 17 on the Special Verdict Form asked: "Did plaintiff misuse her easement rights?" Similarly, question No. 18 on the Special Verdict Form asked: "Did plaintiff intentionally inflict emotional distress upon any defendant?"

such as 911 calls[17] made by Annette, the member of the Dung family who applied for the TRO, refer to the TRO and explain that she was calling to enforce the TRO preventing Ching from stopping on the easement. Annette also testified that once she obtained the TRO she began calling the police on Ching for incidences such as not closing the gate. Annette described the scope of the TRO and used it to justify her 911 call to report utility trucks using the easement to service Ching's house. Annette's entire TRO application, including all of her allegations against Ching, was read into the record. The TRO application was also published to the jury. Darah also testified extensively as to the TRO, and described helping her mom, Annette, write out the application. Later, Darah said "[a]n easement isn't supposed to be used as a tool for harassment." Denby also discussed the TRO and said "[a]s I made clear earlier, we didn't call every time she harassed us. But if we did call, it was because she was harassing us." Moreover, Denby testified that "it hasn't gotten better, even after the TRO . . . so why do we make 911 calls? We don't want to call every day. We don't want to keep telling them. What else do we do?" Denby further testified that "[d]efinitely after the TRO was in place, because she couldn't come on our property and she

---

[17] During trial, the parties often referred to the Injunction Against Harassment as the "TRO," also known as a temporary restraining order.

couldn't stop on our property, so then she started driving up with her cell phone outside of her car because then she wouldn't technically stop." Denby continued, "[o]h, I'm sorry. This is before the TRO, so she still was able to stop."

Ching also testified that after Annette's TRO was granted against her, police came on "too many occasions." She described one occasion where an officer showed up at her door and "said that he was arresting me for violating a protective order . . . [because] I harassed the Dungs by stopping on the driveway and taking pictures." The Dungs' counsel, also asked Ching, "let's move back to that TRO violation or the protective order violation; correct? You remember that? You were arrested for that?" Later, Dungs' counsel asked Ching, "[t]here were two TROs that were filed that got consolidated in the District Court; correct? You filed one against Denby, Dean, and Darah, correct? And Annette Dung filed one against you; correct?"

These numerous examples demonstrate that the Dungs did not suffer a substantial detriment due to the exclusion of the Injunction Against Harassment because they were repeatedly allowed to refer to it and used it to explain why they thought they were entitled to report alleged violations of the Injunction Against Harassment to the police. Accordingly, the

ICA erred in determining that the circuit court abused its discretion in excluding the Injunction Against Harassment.

E.      Invasion of Privacy

        Ching's invasion of privacy claim was based on three legal theories:  (1) intrusion upon seclusion; (2) false light; and (3) unreasonable publicity.  The ICA erred when it ruled that the circuit court improperly submitted Ching's invasion of privacy claim to the jury on the theory of intrusion upon seclusion.  However, the ICA ultimately reached the correct decision when it declined to vacate the jury's verdict on Ching's invasion of privacy claim because it found that there was sufficient evidence to support the claim under false light and unreasonable publicity.  Because, ultimately, the ICA correctly decided the invasion of privacy claim, its error in concluding that there was insufficient evidence to submit the invasion of privacy claim under Ching's theory of intrusion upon seclusion will not be addressed in this Opinion.[18]

---

[18]     The ICA's determination that the circuit court erred by denying the Dungs' JMOL with respect to Ching's invasion of privacy claim based on the theory of intrusion upon seclusion appears to have been based upon an erroneous review of the record.  The ICA held that the Dungs' invasions of Ching's privacy by videotaping her could not support the jury's verdict because the recordings of Ching took place on the easement and in her driveway and these were "public, not []private" places and therefore "the recordings were not of anything outside of the public gaze."  The ICA failed to note evidence, adduced at trial, showing that the Dungs' video cameras did intrude into a private place—Ching's bedroom and backyard.  Ching testified at trial that one of the three cameras that the Dungs installed on their wall facing her property captures images that cover most of her property including

(continued . . .)

F.    Malicious Prosecution

The ICA erred when it held there was insufficient evidence adduced at trial to support the jury's finding that the Dungs engaged in malicious prosecution.  There are two instances that were the bases of Ching's malicious prosecution claim:  (1) Ching was arrested for harassment and the prosecutor "immediately downgraded" the charge to a parking citation to which Ching pleaded guilty and (2) when Ching was allegedly sprayed with water by Darah and Denby, and Ching sprayed them back ("water spraying incident").  For the water spraying incident, Ching was arrested but was acquitted at trial.

In order to prove a civil claim of malicious prosecution in a civil trial, the plaintiff must demonstrate that the prior proceedings:  (1) were terminated in the plaintiffs' favor; (2) were initiated without probable cause; and (3) were initiated with malice.  Young v. Allstate Ins. Co., 119 Hawai'i 403, 417, 198 P.3d 666, 680 (2008).

The ICA incorrectly held that Ching's claim of malicious prosecution for the water spraying incident should not have been submitted to the jury.  Ching demonstrated that the prosecution for the water spraying incident was terminated in

_____

(continued . . .)

her tenant's entire home as well as Ching's home including her bedroom window and her backyard.

42

her favor, and that the prosecution for the water spraying incident was initiated without probable cause and with malice. See id.

First, Ching was acquitted at trial for the water spraying incident. Second, the Dungs initiated the prosecution without probable cause and with malice because the evidence indicates that the Dungs presented false testimony or withheld evidence.

Though closing argument is not evidence, it identifies evidence introduced during trial that supports the jury's verdict. Cf. State v. Basham, 132 Hawai'i 97, 113, 319 P.3d 1105, 1121 (2014), as corrected (Feb. 11, 2014) (closing arguments should only refer to evidence in the record). Here, in closing argument regarding the water spraying incident, Ching's counsel argued in part that the Dungs engaged in civil malicious prosecution because the Dungs had cameras where the alleged "harassment" took place but did not introduce video of the incident to support their story and because Denby's and Darah's testimonies conflicted. In particular, Ching's "exhibit 88"[19] provides minutes that support Ching's counsel's contention that Ching was acquitted, in part, because of Denby's and

---

[19]    The record from the harassment trial, where Ching was acquitted, is limited.

Darah's false and conflicting testimonies.  The August 26, 2014

minutes provide:

> ORALLY CHARGED/NOT GUILTY PLEA ENTERED.  TRIAL
> COMMENCED, CD: 7A/#35: 1:42/2:31:26-.  STATE'S WITNESS:  1)
> DENBY DUNG (2:41:58-2:50/2:58-3:05).  TESTIMONY PAUSED AND
> WITNESS ASKED TO WAIT OUTSIDE OF COURTROOM WHILE DISCUSSION
> BETWEEN COUNSELS AND COURT.
> ORAL MOTION TO DISMISS ENTERED BY DEFENSE.  CASE CONTINUED
> FOR BRIEFS AND DECISION
> WITH FURTHER TRIAL 8/29/14PM-7A BEFORE JUDGE PACARRO.

The above minutes show that Denby's testimony was "paused" and

she "was asked to wait outside[,]" after which Ching made an

"oral motion to dismiss[.]"  The minutes also demonstrate that

Ching did not testify in her own defense or put on any other

witnesses.

Additionally, in the record, the Dungs acknowledged

that they had cameras showing the area where the alleged

"harassment" took place but did not introduce video of the

incident to support their story that Ching harassed Denby and

Darah by spraying them with water.

The ICA is correct that a prosecutor's decision to

bring charges in a criminal proceeding insulates the complainant

from tort liability for malicious prosecution.  Bullen v.

Derego, 68 Haw. 587, 593, 724 P.2d 106, 110 (1986).  However,

the complainant is only insulated when there is no allegation

that the defendant presented false evidence, withheld evidence,

or exerted influence on the prosecutor.  Here, Ching did allege

(and produce evidence) that the Dungs presented false evidence and also withheld evidence, thus negating the "insulation" provided by the prosecutor's "independent determination of probable cause." As such, Ching provided sufficient evidence to meet the second and third elements of malicious prosecution in addition to the first element, which she met when she was acquitted of the charged offense. Therefore, the ICA erred when it held that Ching's malicious prosecution claim was not supported by sufficient evidence to uphold the jury's verdict and when it concluded that the circuit court erred in denying the Dungs' motion for JMOL on the malicious prosecution claim.

## G. General Verdict Rule

Following the ICA's decision to vacate the judgment with respect to Ching's nuisance, invasion of privacy, malicious prosecution, and conspiracy claims, the ICA vacated the jury's entire damage award because it was unable to determine whether the jury relied on an "improper ground" when awarding the damages. Because the ICA incorrectly vacated the jury's judgment with respect to Ching's nuisance, invasion of privacy, malicious prosecution, and conspiracy claims, this court need not answer the question of whether the jury relied on an "improper ground," as the jury's damages award is affirmed.

## V.    CONCLUSION

For the foregoing reasons, we reverse the ICA's September 16, 2019 Judgment on Appeal vacating the circuit court's September 15, 2016 Judgment, November 14, 2016 Order Denying Additur, April 12, 2016 Order re JMOL, January 4, 2017 Order Denying Further JMOL, and January 4, 2017 Order Denying New Trial, and reinstate the jury's damage award.

| | |
|---|---|
| Terrance M. Revere | /s/ Paula A. Nakayama |
| Malia R. Nickison-Beazley | |
| Jonathan L. Ortiz | /s/ Michael D. Wilson |
| Wade J. Katano | |
| Christine S. Prepose-Kamihara | /s/ Todd W. Eddins |
| for Petitioner | |
| | /s/ John M. Tonaki |
| Ronald Shigekane | |
| David J. Minkin | |
| Jesse J.T. Smith | |
| for Respondents | |



CONCURRENCE BY CIRCUIT JUDGE CRABTREE

I respectfully concur with the result.

/s/ Jeffrey P. Crabtree